UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

```
_____
                                )
UNITED STATES OF AMERICA,        )
                                 )
        Plaintiff,               )
                                 )
        v.                       )     Civil Action No. 04-1608 (RWR)
                                 )
DRC, INC.,                       )
                                 )
        Defendant.               )
_____)
```

MEMORANDUM OPINION AND ORDER

The government brings suit against defendant DRC, Inc. (also known as Disaster Relief Construction, Inc.) under the False Claims Act ("FCA"), 31 U.S.C. §§ 3729 *et seq.*, alleging that DRC submitted false pre-qualification documents and false invoices in connection with a contract awarded to DRC to provide relief assistance in Honduras that was financed by the United States Agency for International Development ("USAID").  DRC filed a motion for partial summary judgment on the false invoices claim. The claim alleges that DRC's unauthorized subcontracting of work violated the terms of DRC's contract with Honduras.  The parties dispute whether the contract required DRC to seek USAID's approval for subcontracting and, if so, whether DRC's invoices were false because they impliedly certified that DRC had complied with that obligation when it had not.  There are genuine issues of material fact with respect to elements of the false

invoices claim with regard to claims for payment submitted from December 2000 to April 2001 and after October 2001.  However, the government cannot show that DRC possessed the scienter required to give rise to FCA liability with respect to claims for payment submitted between April 2001 and October 2001.  DRC's motion for partial summary judgment therefore will be granted in part and denied in part.

BACKGROUND

The contract at the heart of this dispute was financed by USAID in order to help Honduras and other countries rebuild after Hurricane Mitch struck in 1998.  USAID collaborated with the Honduran Social Investment Fund ("FHIS"), an agency of the government of Honduras, on a project to construct and reconstruct water, sewer, and sanitation infrastructure in the wake of the hurricane.  (Am. Compl. ¶ 10.)  DRC participated in a competitive bidding process for a contract to perform the construction work and in connection with its bid submitted numerous pre-qualification documents representing its equipment, inventory, personnel, and financial obligations.  (Id. ¶¶ 11-12.)  The pre-qualification documents also requested information about the contractor's plans to subcontract.  (Pl.'s Opp'n to Def.'s First Mot. Partial Summ. J. ("Pl.'s Opp'n"), Exs. 4 and 5.)  DRC did not identify any subcontractors with which it planned to work and

- 3 -

represented that the company had no intention of subcontracting. (Id.)

On the basis of its pre-qualification score and low bid, DRC obtained a contract for construction projects in Honduras. (Am. Compl. ¶ 13.) The contract took the form of a "host country contract," an agreement between a foreign country and a third-party contractor, where USAID provides funding but is not itself a party. (Def.'s Reply in Support of Def.'s First Mot. Summ. J. ("Def.'s Reply"), Def.'s Stmt. of Undisputed Facts for Def.'s First Mot. Summ. J. ("Def.'s Stmt. Undisputed Facts") ¶¶ 10-11.) DRC ultimately submitted twenty eight vouchers for payment under the contract (Compl., Ex. C), each of which the government alleges constitutes a false claim (Am. Compl. ¶¶ 30-36).

I.   SUBCONTRACTING OBLIGATIONS IN THE CONTRACT

The construction contract between DRC and FHIS was executed on June 21, 2000. (Def.'s Stmt. Undisputed Facts ¶ 26.) The contract contained twelve constituent sections, many of which were written only in Spanish.[1] (Id. ¶¶ 4-5.) USAID required the inclusion of two of those sections, Attachment A and Attachment B ("the Mandatory Clauses"), which were rendered both in Spanish and in English. (Id. ¶¶ 6-7.)

_____

[1] Renditions in this opinion of provisions written in Spanish rely on the parties' translations, the accuracy of which has not been contested.

- 4 -

Multiple provisions in the contract addressed subcontracting.  First, Section 28 of the contract provided that "[t]he contractor may not . . . subcontract with third parties without obtaining the advance, written consent of FHIS and USAID."  (Id. ¶ 20; Def.'s First Mot. Summ. J., Ex. 2.)  Section 28 further provided that subcontracted work could not exceed 40 percent of the total work budget.  (Def.'s Stmt. Undisputed Facts ¶ 21.)  The contract listed five instances in which payment could be withheld, including "[f]ailure of the Contractor to make payments due to subcontractors for materials or labor."  (Id. ¶ 157.)

Second, both Attachment A, in Section 3(G)(2)(e), and Attachment B, in Section 3(F)(2)(e), state that "[u]nder a fixed-price construction contract of any value, the prime contractor may procure locally produced goods and services under subcontracts."  (Id. ¶¶ 16-17; Def.'s First Mot. Summ. J., Ex. 3.)

Third, both Attachments, in Section 2, provide that "the Contract has reserved to USAID certain rights such as . . . the right to approve the terms of this Contract, the Contractor, and any or all . . . subcontracts . . . related to this Contract and the Program/Activity of which it is part."  (Def.'s First Mot. Summ. J., Ex. 3.)  Section 2 in Attachment A further states that "[a]ny approval (or failure to disapprove) by USAID shall not bar

- 5 -

the Contracting Agency or USAID from asserting any right, or relieve the Contractor of any liability which the Contractor might otherwise have to the Contracting Agency or USAID." (Id.)[2]

Finally, Attachment A contains Section 14, entitled "Assignment, Subcontract Clauses and Procurements." Subsection A provides that "USAID's prior written consent to any assignment of obligations under the Contract, in addition to the consent of the Contracting Agency, is required"; subsection B obligates the contractor to include specified provisions of the Attachment in all subcontracts. (Id.)[3]

II. DRC'S NEGOTIATIONS CONCERNING SUBCONTRACTING

FHIS issued a notice to proceed on June 23, 2000, two days after the contract was executed, giving DRC fifteen days in which to begin work. (Def.'s Stmt. Undisputed Facts ¶ 27.) According to DRC's Executive Vice President, Sid Vogel, he told FHIS on July 3, 2000 that DRC planned to subcontract and submitted a list of subcontractors for FHIS approval at a meeting with Moises Starkman, the Minister of FHIS, Ramon Cardona, the FHIS director of major infrastructure projects (the "DIM") who was responsible for administering the contract, and others. (Def.'s First Mot.

_____

[2] Section 2 in Attachment B contains the same language, but refers to the "Supplier" rather than the "Contractor." (Def.'s First Mot. Summ. J., Ex. 3.)

[3] The analogous section 14 in Attachment B is entitled simply "Assignment" and contains only the requirement of prior written consent for assignment of obligations. (Id.)

- 6 -

Partial Summ. J., Ex. 8 (Vogel Dep. 71:20-72:10, 152:18-153:20).)

Vogel testified that he asked Starkman the next day "what

[Starkman] want[ed] [Vogel] to do" and Starkman "told [Vogel] to

go to work," which Vogel understood to constitute "approval [for

DRC] to . . . go out there and go to work with these

subcontractors." (Id. 72:11-15.)

Several months later, on November 7, 2000, Cardona sent a

letter to DRC stating that FHIS had "been informed" that DRC was

engaged in subcontracting and reminding DRC that the project "can

only be contracted up to 40 percent of the project, previous

authorization from FHIS." (Def.'s First Mot. Partial Summ. J.,

Ex. 9.) The letter concluded, "[w]e would appreciate that you do

not effect any subcontractions [sic] without previous

authorization." (Id.) Cardona sent a copy of the letter to Todd

Sloan, the head of the USAID section that administered the

construction contract. (Def.'s Stmt. Undisputed Facts ¶¶ 32-33.)

On November 8, 2000, DRC submitted "participation contracts" to

FHIS in order to receive FHIS's legal evaluation of whether those

contracts required formal approval under the construction

contract. (Id. ¶ 37.) In the preceding months, DRC "had

replaced its original subcontracts with 'participation contracts'

and argued, based on advice of Honduran legal counsel, that the

Contract did not require DRC to obtain further approval from FHIS

concerning these 'participation contracts' and [that] the 40

- 7 -

percent [subcontracting] limit did not apply.'" (Def.'s First
Mot. Partial Summ. J., Def.'s Stmt. of Material Facts ("Def.'s
Stmt. of Material Facts") ¶ 34 (citing Ex. 11, Pelaez Dep. at
115:16-118:11; 27:22-28:7).) FHIS issued a legal opinion on
November 11, 2000 that the participation contracts did require
approval and were subject to the limit. (Def.'s Stmt. Undisputed
Facts ¶ 38.)

After receiving FHIS's legal opinion, DRC Project Manager
Francisco Pelaez submitted a memorandum on November 15, 2000
addressed to Starkman acknowledging the parties' difference of
opinion about the status of participation agreements and, given
FHIS's legal position, submitting a list of subcontractors for
the approval of both FHIS and USAID. (Def.'s Stmt. Undisputed
Facts ¶¶ 39-40; Def.'s First Mot. Partial Summ. J., Ex. 18.) The
memorandum represented that, regardless of the form of agreement
with local companies, the budgeted amount was below the 40
percent threshold. (Id.) A series of meetings and letter
exchanges among DRC, FHIS, and USAID followed, lasting several
months. (Def.'s Stmt. Undisputed Facts ¶ 42.) DRC requested
USAID and FHIS approval for subcontracting again later in
November, along with revised subcontract forms. (Id. ¶¶ 61-63.)
A report by a USAID auditor, Christine Byrne, who visited DRC
work sites in November noted that at several work sites it
appeared that DRC had subcontracted the vast majority of the

work.  (Def.'s First Mot. Partial Summ. J., Ex. 12.)  From
December through early March, DRC submitted several requests to
FHIS requesting approval for subcontractors, copying USAID on the
letters.  (Def.'s Stmt. Undisputed Facts ¶¶ 65, 66, 68, 69, 71-
73, 75, 76, 78, 79.)  In January 2001, Sloan wrote to Cardona and
expressed USAID's concern about one subcontractor currently
working for DRC and requested additional information about the
subcontractor.  (Id. ¶ 75.)  Cardona forwarded USAID's request to
DRC.  (Id. ¶ 76.)[4]

At various points during these negotiations, USAID officials
suggested that the portion of overall work that DRC subcontracted
was not important.  USAID contracting head John McAvoy drafted a
December 6, 2000 letter, signed by USAID Mission Director Timothy
Mahoney, in which USAID asked FHIS to increase the permissible
subcontracting quota from 40 percent to 75 percent.  (Def.'s
First Mot. Partial Summ. J., Ex. 39; id., Ex. 1 (McAvoy Dep.
39:9-41:7).)  USAID Deputy Mission Director Joseph Lombardo
testified that the 40 percent limit was a matter of local law and
that, from USAID's perspective, "they could be contracting out 99

---

[4] The adequacy of DRC's response is a disputed point between
the parties.  DRC maintains that it had previously provided the
requested information and informed FHIS of that fact, while the
government contends that DRC never provided the information.
(Def.'s Stmt. of Material Facts ¶ 77; Pl.'s Opp'n to Def.'s Stmt.
of Material Facts in Supp. of First Mot. Partial Summ. J. ¶ 77.)

- 9 -

percent of it and we wouldn't care." (Def.'s First Mot. Partial
Summ. J., Ex. 68 (Lombardo Dep. 120:16-121:9).[5]

FHIS eventually, on March 19, 2001, issued a formal
resolution approving DRC's subcontracting, subject to USAID
review. (Id. ¶¶ 43-44.)  At a meeting with DRC and FHIS on
April 6, 2001, Carlos Flores, a USAID technical officer who
worked under Sloan, represented orally that Flores would be the
"sole representative of USAID in charge of dealing with matters
related to the project" and that approval by USAID "is not
necessary to authorize DRC subcontracting endeavors."  (Def.'s
First Mot. Partial Summ. J., Ex. 24 (Memorandum of Francisco
Pelaez relating minutes of meeting); see also id., Ex. 11 (Pelaez
Dep. 81:9-82:2); Def.'s Stmt. of Material Facts ¶¶ 46-48.)[6]

---

[5] According to DRC, the inclusion of the 40 percent limit on
subcontracting rested on a mistaken interpretation of Honduran
law.  The provisions imposing the limit came verbatim from
Article 88 of the Honduras State Contracting Law, which restricts
the amount a domestic contractor may subcontract on public
projects to a maximum of 40 percent.  (Def.'s Stmt. Undisputed
Facts ¶¶ 112-113.)  However, Article 123 of the same law requires
that foreign companies subcontract a minimum of 40 percent of
work to local companies.  (Id. ¶ 115.)  The origin of this
provision is not relevant to the resolution of the instant
motion.  The government's theory of implied false certification
is that USAID *approval* of DRC's subcontractors was material to
payment, irrespective of the allowable *amount* of subcontracting
under the contract.

[6] The government does not dispute that Flores made these
statements to DRC.  (Cf. Pl.'s Opp'n to Def.'s Stmt. of Material
Facts in Supp. of First Mot. Partial Summ. J. at 3, 7.)

- 10 -

In June 2001, DRC changed the subcontractors assigned to certain project sites and advised FHIS and USAID of the changes. (Def.'s Stmt. Undisputed Facts ¶ 90.)  In August 2001, DRC's new project manager, Mario Maciel, sought a formal response from Sloan about subcontracting by sending a copy of the March 2001 FHIS resolution and stating that DRC "assume[d] that [Sloan] had no objections to th[e] approval."  (Def.'s First Mot. Partial Summ. J., Ex. 66.)  Sloan's response is a disputed point between the parties.  DRC proffers an undated, unsigned "draft response" from Sloan to Maciel, in which Sloan stated that USAID is "concerned that DRC, Inc. previously subcontracted work . . . without the prior approval of USAID and FHIS," but that "[i]n light of the need to complete the work . . ., [USAID] will raise no objection to the approval by FHIS set forth in the FHIS Resolution; however, USAID reserves all of its rights with respect to the subcontracting of work by DRC, Inc. . . . without the prior approval of USAID and FHIS."  (Def.'s First Mot. Partial Summ. J., Ex. 67.)  The government meanwhile proffers a letter to Maciel, signed by Sloan and dated October 16, 2001, in which Sloan states "subcontracting requires *prior* written approval of FHIS *and* USAID" and that "USAID (i) cannot retroactively approve the subcontracting of work already completed under the Group I Contract, (ii) reserves all its rights regarding compliance with Section 28 of the Group I

- 11 -

Contract." (Pl.'s Opp'n, Ex. 15.) The letter then enumerated the information and documents that DRC should submit to secure USAID approval in the future. (Id.)

During the ongoing discussions about DRC's subcontracting, USAID issued a Letter of Commitment, on December 5, 2000, in which it "guarantee[d] payment" to DRC "in accordance with the terms and conditions specified in the contract." (Def.'s First Mot. Partial Summ. J., Ex. 70.) DRC submitted on December 11, 2000 its first invoice for work performed (Def.'s Stmt. Undisputed Facts ¶ 53), and it certified that "the services . . . for which payment is requested have been satisfactorily performed (delivered) and the payment requested is in accordance with the terms of the contract." (Compl., Ex. C2.)[7] Each subsequent invoice contained an identical certification. (Id., Exs. C3-C28.)

III. THE SUIT

The government filed suit under the False Claims Act in September 2004. The government alleges that DRC made false statements in its pre-qualification documents regarding its inventory, equipment, and personnel (Am. Compl. ¶¶ 16-23), and that it falsely certified performance of work that had actually been completed by unauthorized subcontractors (Am. Compl. ¶¶ 24-

---

[7] It is undisputed that DRC's first invoice, submitted July 3, 2000, was for mobilization only, and not for work performed. (Def.'s Stmt. Undisputed Facts ¶ 52; Compl., Ex. C1.)

- 12 -

34).  DRC's motion to dismiss for failure to state a claim, lack
of personal jurisdiction, and improper venue, or, alternatively,
to transfer, was denied.

In its pending motion for partial summary judgment, DRC
argues that its invoices were not false because the underlying
contract permitted subcontracting, because the FHIS approved the
subcontracting and USAID told FHIS and DRC that USAID approval
was unnecessary, and because DRC's invoices did not impliedly
certify that no unapproved subcontracting had taken place.  DRC
also argues that it is entitled to judgment on the false invoices
claim because DRC lacked the requisite scienter and because the
government did not suffer any actual damages from DRC's
subcontracting.  DRC's motion for partial summary judgment does
not address the government's allegations regarding the pre-
qualification process.[8]

---

[8] In addition to asserting liability on the basis of a false
implied certification theory, the government's opposition also
appears to contend that DRC may be liable under a fraudulent
inducement theory because DRC would not have been awarded the
contract had USAID known of its intent to subcontract
extensively.  (Pl.'s Opp'n at 9-11.)  This argument overlaps with
the government's distinct pre-qualification documents claim -- on
which DRC has not moved for summary judgment -- that DRC would
not have obtained the contract had it not misrepresented its
inventory, personnel, and equipment.  DRC does not directly
address the fraudulent inducement theory in its motion or in its
reply.

- 13 -

DISCUSSION

A party may move for summary judgment on an individual claim

or part of a claim.  Fed. R. Civ. P. 56(a).  Summary judgment may

be granted when the pleadings, the discovery and disclosure

materials on file, and any affidavits show "that there is no

genuine dispute as to any material fact and the movant is

entitled to judgment as a matter of law."  Id.; see also Moore v.

Hartman, 571 F.3d 62, 66 (D.C. Cir. 2009).  A court considering a

motion for summary judgment must draw all "justifiable

inferences" from the evidence in favor of the nonmovant.

Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986).  The

nonmovant must either "come forward with specific facts showing

that there is a genuine issue for trial[,]" or show that the

materials by the movant do not establish the absence of a genuine

dispute.  Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio

Corp., 475 U.S. 574, 587 (1986) (internal quotation marks and

emphasis omitted).

The FCA created a cause of action against anyone who

"knowingly presents, or causes to be presented, to an officer or

employee of the United States Government . . . a false or

fraudulent claim for payment or approval[.]"  31 U.S.C.

§ 3729(a)(1) (2000).[9]  "[T]he elements of section 3729(a)(1) are

_____

[9] Congress amended the FCA in the Fraud Enforcement and
Recovery Act of 2009 ("FERA"), altering slightly the language in
the presentment provision.  The amendment of the presentment

- 14 -

(1) the defendant submitted a claim to the government, (2) the claim was false, and (3) the defendant knew the claim was false." United States ex rel. Harris v. Bernad, 275 F. Supp. 2d 1, 6 (D.D.C. 2003). "Any request for payment is properly considered a claim for purposes of the FCA." United States ex rel. Siewick v. Jamieson Sci. & Eng'g, Inc., 214 F.3d 1372, 1375-76 (D.C. Cir. 2000); see also 31 U.S.C. § 3729(c) (defining claim broadly to include "any request or demand, whether under a contract or otherwise, for money or property which is made to a contractor, grantee, or other recipient if the United States Government provides any portion of the money or property which is requested or demanded.")

A claim may be "legally false" if it represents falsely that the party submitting the claim has complied with an applicable federal statute or regulation, or with a contractual term. United States v. Sci. Applications Int'l Corp., 626 F.3d 1257, 1266 (D.C. Cir. 2010) ("SAIC"). Such a "false certification" can be inferred from silence if "certification was a prerequisite to the government action sought." Siewick, 214 F.3d at 1376. "To establish FCA liability under an implied certification theory,

--------------------

provision took "effect on the date of enactment of this Act and shall apply to conduct on or after the date of enactment[.]" Pub. L. No. 111-21, § 4, 123 Stat. 1617, 1625 (2009). Since the alleged conduct here occurred before 2009, the provision as amended in 2009 does not apply here, and references in this opinion to § 3729(a)(1) are to the pre-amendment version.

- 15 -

the plaintiff must prove by a preponderance of the evidence that compliance with the legal requirement in question is material to the government's decision to pay." SAIC, 626 F.3d at 1271.  The materiality of a contractual requirement may be evident from "[t]he existence of express contractual language specifically linking compliance to eligibility for payment." Id. at 1269.  But a contractual requirement can also be considered material in the absence of express language if "both parties to the contract understood that payment was conditional on compliance with the requirement at issue." Id.; see also United States v. TDC Mgmt. Corp., Inc., 288 F.3d 421, 426 (D.C. Cir. 2002) (noting that withholding "'information critical to the decision to pay'" is a false claim (quoting Ab-Tech Constr., Inc. v. United States, 31 Fed. Cl. 429, 434 (Fed. Cl. 1994))).  Interpreting the plain language of a contract is a question of law, not a question of fact.  See LTV Corp. v. Gulf States Steel, Inc. of Ala., 969 F.3d 1050, 1055 (D.C. Cir. 1992).

The FCA also imposes a scienter requirement, requiring that a defendant present a false claim knowingly, which entails having "actual knowledge of the information[,]" acting "in deliberate ignorance of the truth or falsity of the information[,]" or acting "in reckless disregard of the truth or falsity of the information." 31 U.S.C. § 3729(b).  "Strict enforcement of the FCA's scienter requirement will . . . help to ensure that

- 16 -

ordinary breaches of contract are not converted into FCA

liability." SAIC, 626 F.3d at 1271.   If parties to a contract

merely disagreed about how to interpret ambiguous contract

language, the government cannot satisfy the requirement to show

that the defendant presented claims knowingly.   United States ex

rel. K&R Ltd. P'ship v. Mass. Housing Finance Agency, 530 F.3d

980, 984 (D.C. Cir. 2008).   Liability under an implied

certification theory therefore is limited to cases where "the

contractor knew, or recklessly disregarded a risk, that its

certification of compliance was false." Shaw v. AAA Eng'g &

Drafting, Inc., 213 F.3d 519, 533 (10th Cir. 2000).

"Establishing knowledge under this provision [section 3729(a)(1)]

on the basis of implied certification requires the plaintiff to

prove that the defendant knows (1) that it violated a contractual

obligation, and (2) that its compliance with that obligation was

material to the government's decision to pay." SAIC, 626 F.3d at

1271.

Claims for payment submitted under a contract procured by

fraud also may be actionable.   See United States ex rel. Bettis

v. Odebrecht Contractors of Cal., Inc., 393 F.3d 1321, 1326 (D.C.

Cir. 2005).   Congress intended that "'each and every claim

submitted under a contract . . . or other agreement which was

originally obtained by means of false statements or other corrupt

or fraudulent conduct . . . constitutes a false claim" under

- 17 -

§ 3729(a).  Id. (quoting S. Rep. No. 99-345, at 9 (1986),

reprinted in 1986 U.S.C.C.A.N. 5266, 5274).  In United States ex

rel. Schwedt v. Planning Research Corp., 59 F.3d 196, 197 (D.C.

Cir. 1995), the D.C. Circuit considered an FCA action against a

defendant who contracted to design software for the government.

The court noted that a § 3729(a)(1) claim could rest on

allegations that the defendant "made an initial misrepresentation

about its capability to perform the contract in order to induce

the government to enter into the contract[,] and . . . this

original misrepresentation tainted every subsequent claim made in

relation to the contract[.]"  Id. at 199.[10]

A defendant who submits a false claim "is liable for civil

penalties regardless of whether the government shows that the

submission of that claim caused the government damages."  SAIC,

626 F.3d at 1277.  The defendant may also be liable for "3 times

the amount of damages which the Government sustains because of

the act of [the defendant]."  Id. at 1277-78 (quoting 31 U.S.C.

§ 3729(a)).  Damages may arise even where the defendant completes

satisfactorily the work required under the contract, if the

defendant's violation of the contract provisions deprived the

---

[10] Thus, the government may seek to hold DRC liable for each
claim for payment on the government's fraudulent inducement
theory -- the theory about which DRC did not seek summary
judgment -- wholly independent of the government's allegations
that all of DRC's claims for payment falsely implied that DRC
complied with the requirement to obtain prior written approval
for subcontracting.

- 18 -

government of receiving the work under the conditions it
required.  In SAIC, the defendant contended that its alleged
violation of conflict-of-interest provisions did not give rise to
damages because the defendant completed the required work.  The
D.C. Circuit rejected the argument since it was reasonable to
conclude that "no matter how technically proficient SAIC's
performance, the value of that performance [to the
government]. . . was compromised by the appearance of bias
created by the company's failure to live up to its contractual
conflict of interest obligations."  Id. at 1278.[11]

I.  PRESENTMENT

DRC argues in its reply in support of its motion for partial
summary judgment that the government cannot prove its FCA claim
because the government was not a party to the contract between

---

[11] In view of this case law, DRC's argument that the
government suffered no damages, because the construction work for
Honduras was satisfactorily performed under the contract, is
without merit.  The D.C. Circuit has held that in cases "where
the defendant fraudulently sought payments for participating in
programs *designed to benefit third-parties rather than the
government itself*, the government can easily establish that it
received nothing of value from the defendant and that all
payments made are therefore recoverable as damages." SAIC, 626
F.3d at 1279.  The government argues that USAID's funding of the
contract was a humanitarian project, implemented in part to
promote foreign policy objectives, and that it was willing to pay
more for adherence to contractual requirements.  (Pl.'s Opp'n at
33.)  The construction contract produced tangible benefit for
Honduras, not for the government.  The degree to which alleged
misrepresentations in the pre-qualification documents vitiated
the value to the government of the contract awarded to DRC would
be relevant to calculating damages.

- 19 -

DRC and FHIS.  (Def.'s Reply at 7-8.)  However, DRC cites no
authority for the proposition that liability under the FCA
depends on the existence of a contract between the claimant and
the government; what matters is whether DRC submitted to the
government a claim for payment.  Because FHIS may readily be
characterized as a grantee of the United States, satisfying the
FCA's presentment requirement entails showing either that "the
Government provides the funds to the grantee upon presentment of
a claim [by the defendant] to the Government" or that "after the
grantee presents the claim, the Government provides the funds
directly to the claimant[.]"  United States ex rel. Totten v.
Bombardier Corp., 380 F.3d 488, 493 (D.C. Cir. 2004) (emphasis
omitted).  USAID disbursed funds directly to DRC upon receipt of
invoices that included certifications from both DRC and FHIS.
(See Compl., Ex. C.; see also Def.'s First Mot. Partial Summ. J.,
Ex. 3 (Attachment A, Section 13, Alternative II (A)(1))
("Payments under this Contract shall be made in U.S. Dollars
financed with funds made available by USAID.  Such payments will
be made to the Contractor directly by USAID[.]").)  This
financing arrangement satisfies the requirement that DRC
submitted claims for payment to the government.

II.  IMPLIED FALSE CERTIFICATION

     DRC does not contest that it subcontracted work without
obtaining written prior approval from USAID.  The claims for

- 20 -

payment DRC made under the contract may be considered "false"
therefore if the contract (1) required DRC to secure USAID's
prior approval for subcontracting, (2) that requirement was
material, and (3) DRC withheld information about its non-
compliance with that requirement.  The government must also prove
that DRC *knew* that it violated the requirement and *knew* that its
compliance with the requirement was material to the government's
decision to pay.  SAIC, 626 F.3d at 1271.

A.   Contractual obligations

If FCA liability is to be premised on an implied false
certification of compliance with contractual term, the term must
be clear and unambiguous because FCA liability is not triggered
where parties "simply disagree about how to interpret ambiguous
contract language." Mass. Housing Finance Agency, 530 F.3d at
984; see also United States v. Kellogg Brown & Root Srvcs., Inc.,
800 F. Supp. 2d 143, 156 (D.D.C. 2011) (emphasizing that a
contractor "should not face the severe penalties of the FCA for
merely tangential violations").  DRC argues that the contract
gave it "unconditional authorization to subcontract to local
subcontractors" because the Mandatory Clauses provided that
"[u]nder a fixed-price construction contract of any value, the
prime contractor may procure locally produced goods and services
under subcontracts." (Def.'s Mem. of P. & A. in Support of First

- 21 -

Mot. Partial Summ. J. ("Def.'s Mem.") at 4-5.)[12]  DRC maintains

this contention despite the fact that the contract clearly

provided that "[t]he contractor may not . . . subcontract with

third parties without obtaining the advance, written consent of

FHIS and USAID" (Def.'s First Mot. Partial Summ. J., Ex. 2,

Section 28).  The Mandatory Clauses provide, in Section 15, that,

in the event the terms of the contract conflict with provisions

of the Mandatory Clauses, the Mandatory Clauses control.  (See

Def.'s First Mot. Partial Summ. J., Ex. 3 ("[F]or matters which

are addressed in both the text of such Contract and this

Attachment, the provisions of this Attachment will constitute

additional requirements for the Contract and, in the event of

ambiguity or conflict between any provision in the text of the

Contract and any provision(s) set forth in this Attachment, the

provisions in this Attachment will control.")  Relying on this

provision, DRC argues that the Mandatory Clauses' general dictate

that "the prime contractor may procure locally produced goods and

services under subcontracts" (id.), without mention of any

necessary approval, trumps the approval requirement found in the

text of the contract.  (Def.'s Mem. at 6.)

DRC's interpretation of the contract is not tenable.  The

term of the Mandatory Clauses allowing DRC to subcontract for

---

[12] The government concedes that the contract was a fixed-
price contract.  (Pl.'s Opp'n to Def.'s Stmt. of Material Facts
¶ 18.)

- 22 -

local services does not conflict with Section 28.  The two
provisions are complementary, and the Mandatory Clauses may be
harmonized with other, more specific provisions.  Although
nothing in the Mandatory Clauses' express reservation to USAID of
"the right to approve . . . subcontracts" (Def.'s First Mot.
Partial Summ. J., Ex. 3, Section 2) makes clear that DRC would be
required to make a formal submission to USAID for approval before
subcontracting, the specific contract language in Section 28
explicitly does require prior written approval from USAID.  The
Mandatory Clauses' general grant of permission to use
subcontracts simply does not provoke "ambiguity or conflict"
regarding whether approval is necessary, because it is easily
read alongside the more specific provisions describing the
circumstances under which subcontracting may occur.  In sum, the
contract did not provide unconditional authority for DRC to
subcontract, but rather permitted subcontracting subject to the
approval of FHIS and USAID.[13]

---

[13] The government argues that Section 14 of the Mandatory
Clauses clearly required that DRC secure prior approval from
USAID for subcontracting.  Section 14 provides that "USAID's
prior written consent to any *assignment* of obligations under the
Contract, in addition to the consent of the Contracting Agency,
is required."  (Def.'s First Mot. Summ. J., Ex. 3 (emphasis
added).)  An "assignment" of contract obligations, however, as
DRC points out, is a practice that is distinct from
subcontracting work under the contract.  (Def.'s Reply at 6.)  An
assignment transfers completely a right or obligation under the
contract to a third party, whereas when a party subcontracts with
a third party for the performance of some work, the party retains
all obligations under the contract.  This point is confirmed by a

B.   Materiality and scienter

DRC's invoices can be considered false under an implied false certification theory only if they represent falsely that DRC complied with a contractual term that is *material* to payment. SAIC, 626 F.3d at 1269.   USAID pre-approval of subcontractors could not be considered material *per se*, because no contractual provision expressly linked pre-approval to DRC's eligibility for payment.   Id.   The contract enumerated five instances in which

---

comparison of the versions of Section 14 found in both Attachments.   In Attachment A, the section is entitled "Assignment, Subcontract Clauses and Procurements," and it includes three subsections corresponding with each practice. Subsection A, addressing assignment, contains the prior written approval requirement.   Subsection B, addressing subcontracts, simply obligates the contractor to include specified provisions of the Attachment in all subcontracts.   (Def.'s First Mot. Summ. J., Ex. 3.)   In Attachment B, the analogous Section 14 is entitled only "Assignment" and contains the requirement of prior written consent for assignment of obligations.   Although the structure of these provisions confirms that the prior written consent requirement specified in the Mandatory Clauses relates to a contractor's assignment of obligations, not to subcontracting, Section 28 imposes a prior written consent requirement with regard to subcontracting.

In addition, the government's briefing contends that Section 3(C)(3)(b) of the Mandatory Clauses, requiring that "[a]t least half of the supervisors and other Key personnel specified in the Contract schedule working at the Program/Activity site(s) must be citizens or permanent legal residents of the United States" (Def.'s First Mot. Summ. J., Ex. 3), is relevant to assessing DRC's liability for false invoices.   (Pl.'s Opp'n at 6.)   The government's complaint alleges liability because DRC "incorrectly certified that DRC performed the work required by the contract" (Am. Compl. ¶ 24) and "neither requested, nor received, prior written approval from USAID or FHIS to authorize any of these subcontracts" (id. ¶ 29).   Section 3(C)(3)(b) bears only tangentially on subcontracting and imposes no requirement of any prior authorization.

- 24 -

payment could be withheld, and did not include failure to obtain
prior approval for subcontracting among them.  (Def.'s Stmt.
Undisputed Facts ¶ 157.)  In the absence of an express link to
payment eligibility, the materiality of USAID approval must rest
on record evidence that "both parties to the contract understood
that payment was conditional on compliance with the requirement
at issue." SAIC, 626 F.3d at 1269.  The materiality inquiry into
the parties' *understanding* of the importance of specified terms
overlaps with the FCA's scienter requirement that a defendant
have submitted false claims *knowingly*.  Articulating the scienter
standard, the D.C. Circuit stated that the government must "prove
that the defendant knows that it (1) "violated a contractual
obligation, and (2) that its compliance with that obligation was
material to the government's decision to pay," SAIC, 626 F.3d at
1271.[14]  Where materiality is established by reference to the

_____

[14] In its opening brief, DRC relied on a scienter standard
provided by Allison Engine Co., Inc. v. United States ex rel.
Sanders, 553 U.S. 662 (2008) (requiring a FCA plaintiff to prove
that the defendant *intended that the false record or statement be
material* to the Government's decision to pay or approve the false
claim). (Def.'s Mem. at 34.)  Allison Engine addressed scienter
in the context of 31 U.S.C.A. § 3729(a)(2) (imposing civil
liability on any person who "knowingly makes, uses, or causes to
be made or used, a false record or statement to get a false or
fraudulent claim paid or approved by the Government"), but as DRC
noted, the government's implied certification claim arises under
§ 3729(a)(1).  (Def.'s Reply at 3-5).  The D.C. Circuit's holding
in SAIC articulates the appropriate scienter standard in this
context.  SAIC was decided after the government submitted its
opposition, but before DRC replied.  Although DRC cited SAIC for
other purposes in its reply, it did not address SAIC's holding
regarding scienter.

parties' own understanding, evidence that a defendant
"underst[ands] that payment [is] conditional on compliance with
the requirement at issue," id. at 1269, may also reflect the
defendant's knowledge that its violation of the requirement is
"material to the government's decision to pay," id. at 1271.
Because the FCA does not proscribe fraudulent activity in general
but rather prohibits the knowing submission of false claims, the
requisite knowledge must be proven to exist not at just any time
in the course of the parties' interactions but at the point at
which a defendant submits its claims for payment.  See, e.g.,
United States ex rel. Hockett v. Columbia/HCA Healthcare Corp.,
498 F. Supp. 2d 25, 57 (D.D.C. 2007) (emphasizing that the FCA
"goes after claims that are false, not claims that are submitted
while fraud is afoot"); Harrison v. Westinghouse Savannah River
Co., 176 F.3d 776, 785 (4th Cir. 1999) ("The statute attaches
liability, not to the underlying fraudulent activity or to the
government's wrongful payment, but to the claim for payment.")
(internal quotations marks omitted).  Accordingly, even if the
government establishes that USAID's prior approval for
subcontracting was material, it must also prove that DRC knew
that it was in violation of that requirement when it submitted
its claims for payment.

Although only DRC and FHIS were "parties to the contract" at
issue here, as is discussed above, the financing arrangement

- 26 -

suffices to expose DRC to liability if the "government's decision
to pay," SAIC, 626 F.3d at 1271, depended on DRC's false implied
certification of compliance with its obligation to seek prior
authorization for subcontractors.  To survive summary judgment,
the government must provide evidence that USAID, rather than
FHIS, considered DRC's securing of USAID approval sufficiently
important and that DRC knew it had violated the pre-approval
requirement and that the requirement was material to payment.
The extensive record demonstrates that there are triable issues
regarding these facts.

     The government contends that DRC's understanding that
USAID's approval was important can be inferred from DRC's actions
during the pre-qualification stage.  DRC's Executive Vice
President signed numerous documents during the pre-qualification
stage of the public competition for the host country contract,
including "every page of what became attachment A [of the
Mandatory Clauses]," representing that DRC did not intend to
subcontract.  (Pl.'s Opp'n at 10-11.)  The government argues that
prompt execution of subcontracts following award of the host
country contract demonstrates DRC's pre-existing intent to
subcontract on a large scale and in violation of the terms of the
host country contract.  (Id.)  DRC maintains that, because FHIS
required DRC to begin work only weeks after the execution of the
contract, DRC was "forced . . . to abandon its original approach

and to subcontract a portion of each project." (Def.'s Mem. at 7.)  The government proffers evidence suggesting that DRC intended to subcontract even before the bid.  (See Pl.'s Opp'n 11-12 n.1 (quoting deposition testimony of Robert Isakson, DRC's Founder and Managing Director that DRC was "talking to a couple of subcontractors before the bid").)  Fraudulent intent may be inferred in circumstances where a defendant rapidly repudiates promises after a contract is awarded, Bettis, 393 F.3d at 1330, and such inconsistency might demonstrate the parties' understanding that the promise was important to the decision to award the contract.  The pre-qualification documents did not require DRC to promise or certify that it would not subcontract, and the government does not point to any notification to DRC during the pre-qualification stage that USAID approval would be required in the event it did subcontract.  Nonetheless, the parties agreed to a contract bearing an explicit prior approval requirement.  USAID insisted on adding language appearing in Section 2 of both Attachments reserving its right to approve all subcontracts, and to assert that right against DRC despite any failure by USAID to disapprove a subcontract.  Drawing justifiable inferences from the evidence in favor of the non-movant, a reasonable jury might find that the pre-qualification documents inquired about subcontracting, DRC hid its intent to subcontract, the contract contained multiple provisions

addressing and requiring subcontracting pre-approval, and the
parties considered subcontracting procedures important to
contract award and payment.[15]

The government also argues that DRC's replacement of its
original subcontracts with "participation agreements" DRC hoped
would avoid the prior approval requirement also tends to show
DRC's perception that prior approval for subcontracting was an
important contractual obligation.[16]   DRC maintains that it
attempted to use participation agreements on the advice of its
Honduran counsel, and that it promptly submitted the agreements

_____

[15] Evidence that USAID regulations require that program
funding not be paid to subcontractors who have not been
pre-authorized by USAID (Pl.'s Opp'n, Ex. 2 (Agency Directive
E305.5.7a (requiring inclusion of clause reserving USAID's right
to approve subcontractors))) is relevant to assessing the
government's perception of the importance of including those
terms in the contract.   DRC contests the importance of this
evidence, arguing that the regulations are not binding and that
the government cannot rely on them to maintain an implied false
certification action "for failure to comply with federal
regulations."  (Def.'s Reply at 16.)   DRC, however, conflates the
source of the obligation on which an implied certification theory
depends with the relevant evidence to which a court may look to
determine whether the government considered the obligation
material.   The agency directives are not proffered as a binding
requirement with which DRC allegedly falsely certified its
compliance.   Rather, the government's theory is that DRC failed
to comply with a contractual term, and the agency directives are
relevant to determining the importance of the term to one of the
parties.

[16] In its reply, DRC moved to strike under Rule 56(c)(2) the
government's Exhibit 10, which contained interview notes by a
USAID agent representing statements from former DRC employees and
USAID employees concerning DRC's alleged efforts to conceal
subcontracting.   The government did not respond to the motion and
this opinion does not rely on Exhibit 10.

- 29 -

to FHIS in order to determine their status under the contract and did so before submitting any work invoices under the contract. (Def.'s Mem. at 8.)  Assessing the credibility and implications of DRC's representations is not an appropriate task on summary judgment.  The evidence is sufficient to raise a jury question whether DRC's pursuit of participation agreements in lieu of subcontracts tends to prove that DRC understood the procedures surrounding subcontracting, including the prior approval requirement, to be material to payment.

In addition to establishing a triable issue whether the pre-approval requirement was material to payment, the record reflects a triable issue whether DRC possessed the requisite knowledge of materiality when it submitted its claims for payment.  The government's awareness of a defendant's activities is relevant to determining a defendant's knowledge that its claims for payment are impliedly false.  "The fact that the government knew of [a contractor's] mistakes and limitations, and that [the contractor] was open with the government about them, suggests that while [the contractor] might have been groping for solutions, it was not cheating the government in the effort." Wang ex rel. United States v. FMC Corp., 975 F.2d 1412, 1421 (9th Cir. 1992). Although there is some evidence favoring DRC's position that it was forthcoming with its subcontracting plans, there is also evidence that supports the opposite conclusion.  On the one hand,

DRC initiated communication with FHIS regarding subcontracting as early as July 3, 2000, less than two weeks after the execution of the host country contract on June 21, 2000.  Early openness about subcontracting would tend to support DRC's argument that it was forthcoming with its plans and engaged in good faith negotiations to meet its contractual obligations.  And, according to Vogel, Starkman told Vogel the day after the July 3, 2000 meeting that DRC should "go to work," which Vogel testified he understood to constitute "approval [for DRC] to . . . go out there and go to work with these subcontractors."  (Vogel Dep. 72:11-15.)  On the other hand, Section 28 of the contract required prior *written* consent of *both* FHIS and USAID.  Whatever a jury might find concerning what Vogel believed Starkman's consent to mean, DRC offers no evidence that DRC sought USAID approval of subcontractors in July 2000, or at any point over the following three months.

The course of the discussions concerning DRC's subcontracting, which began in November 2000, also could lead a jury to draw different conclusions.  In December 2000, in the midst of those negotiations, USAID issued a letter of commitment guaranteeing payment to DRC under the contract and DRC submitted its first work invoice.  (Def.'s Stmt. Undisputed Facts ¶¶ 53, 108.)  USAID paid this invoice and twenty one others submitted between December 11, 2000 and March 4, 2002.  (Id. ¶ 98.)  That

the government committed to paying and indeed paid DRC even after it knew that DRC had subcontracted without approval could be found to support DRC's argument that it did not know the pre-approval requirement was important to payment.  DRC argues that USAID did not respond to its multiple requests to approve its subcontractors, and instead simply facilitated negotiations between DRC and FHIS, including encouraging FHIS to raise the 40% limit on subcontracting, precluding a finding that DRC knew prior USAID approval was important to payment.  The undisputed fact that on April 6, 2001, USAID technical officer Flores told DRC orally that USAID pre-approval was not necessary lends further support for this position.  (Id. ¶¶ 46-47.)

However, a reasonable jury might conclude from other evidence regarding the negotiations that DRC did possess the requisite scienter.  In January 2001, a USAID official responded to a subcontracting request, via FHIS, by requesting additional information from DRC.  (Id. ¶¶ 75-76.)  FHIS's letter to DRC informing DRC of USAID's request urged DRC to "send[] the requested information as soon as possible in order to obtain the approval from USAID for the subcontracts."  (Def.'s First Mot. Partial Summ. J., Ex. 48.)  This tends to show that DRC was on notice of the importance of USAID pre-approval.  USAID's general non-responsiveness to DRC's requests could weigh against finding that DRC knew that, by not securing prior written authorization

from USAID, it was in violation of a contractual obligation that was sufficiently important to the government.  But courts must "eschew making credibility determinations or weighing the evidence" in deciding summary judgment motions.  <u>Czekalski v. Peters</u>, 475 F.3d 360, 363 (D.C. Cir. 2007).  In determining how USAID's responses or lack of responses might affect DRC's scienter, a reasonable jury might also consider the impact of the delay of several months between DRC's beginning work under the contract and USAID's learning of the subcontracting issues.  The government argued that this delay forced USAID into the position of not being able to insist on compliance with contractual requirements.  According to the government, USAID failed to assert its right to require prior written approval because it did not want to interrupt assistance to Honduras.  The government, for example, has presented evidence that USAID officials considered suspending the contract, but decided against it "given the amount of work that was already in progress."  (Pl.'s Opp'n, Ex. 12 (Lombardo Dep. 77-78).)  <u>See</u> <u>United States ex rel. Harrison v. Westinghouse Savannah River Co.</u>, 352 F.3d 908, 917 (4th Cir. 2003) (noting that a contractual obligation may qualify as material even though the government continues to fund the contract after learning of wrongdoing by a contractor because "to avoid further costs the government might want . . . to continue the project rather than terminate the contract and start over").

- 33 -

Although the government presented no evidence that DRC was privy to these internal discussions, a reasonable jury might conclude that DRC was aware of the urgency of disaster relief and that it knew that the prior approval provision was important to payment, even though under the circumstances USAID did not strictly enforce it.

In light of the above evidence regarding scienter, the record establishes a triable issue for all but one period -- the distinct period of time from April 2001 to October 2001.  In April 2001, Flores told DRC that USAID would not require DRC to seek prior approval from USAID for subcontracting.  The government does not dispute the fact of Flores' representation and does not proffer any evidence tending to qualify or contradict Flores' remarks.  The government's general argument that USAID was forced into a position of not being able to insist on compliance with contractual requirements does not suffice to explain how DRC could have known pre-approval was important at all, much less critical to payment, after a USAID official explicitly told DRC that USAID's approval was not necessary. Presented with the undisputed fact of Flores' remarks, no reasonable jury could find DRC possessed the requisite scienter that claims submitted after Flores' remarks -- at least until October 2001 -- were false.

- 34 -

The government has, however, proffered evidence sufficient
to revive its case with respect to claims for payment following
October 2001.  In response to DRC's August 2001 request for a
"formal response" from USAID regarding subcontracting approval,
the government says Sloan informed DRC in October 2001 that prior
authorization was required and that USAID could not retroactively
approve the subcontractors.  Sloan's letter set out the eight
kinds of information that USAID would need in order to approve
subcontractors in the future.  (Pl.'s Opp'n, Ex. 15.)  The
inconsistency between Sloan's representation and Flores' oral
representation a few months earlier is relevant to assessing
whether the pre-approval requirement was understood by DRC to be
of sufficient importance to the government even after Sloan
affirmed the requirement.  Nevertheless, viewing the evidence in
the light most favorable to the nonmoving party, a reasonable
jury could find, based on Sloan's affirmation that USAID
considered its prior written approval important, that DRC knew it
was violating that obligation by failing to secure approval going
forward.

<u>CONCLUSION AND ORDER</u>

The contract underlying this dispute required USAID approval
for DRC subcontracting.  The record is insufficient to support
DRC's entitlement to judgment as a matter of law with respect to
claims submitted from December 2000 to April 2001 and from

- 35 -

October 2001 through March 2002.  With respect to claims

submitted following Flores' representation on April 2, 2001 and

before Sloan's alleged communication to DRC on or about

October 16, 2001, however, the government has failed to create a

triable issue that DRC knew that compliance with the contract's

pre-approval requirement was material to payment.  Therefore, it

is hereby

ORDERED that DRC's first motion [43] for partial summary

judgment be, and hereby is, GRANTED IN PART AND DENIED IN PART.

Judgment is granted to DRC on the government's claim of implied

false certifications on DRC's invoices submitted between April 2,

2001 and October 16, 2001.  The motion is otherwise denied.  It

is further

ORDERED that the parties meet and confer and file a joint

status report by May 23, 2012 reflecting their progress in

concluding discovery and proposing three mutually agreeable dates

for a continued post-discovery status conference.

SIGNED this 21st day of April, 2012.


_____/s/_____
RICHARD W. ROBERTS
United States District Judge